The central issue presented on this appeal is whether the law of Alabama affords a remedy for breach of an express promise in a written contract to "act in good faith," and if so, whether there is substantial evidence in the record that the defendant breached its affirmative obligation to so act.
The trial court granted summary judgment in favor of the defendant, Church's Fried Chicken, Inc. ("Church's"), and against the plaintiffs, Gary Tanner, Herman Gollotte, and Walter Hovell, former stockholders of Crispy Chick, Inc., who had sold out to Church's. We hold that the summary judgment was proper, and we affirm.
The suit arose from the following facts. In December 1985, the plaintiffs negotiated a $3.2 million sale of their fried chicken restaurant chain to Church's, and negotiated an additional compensation feature in the purchase agreement that would pay them a finder's fee of one percent of gross sales up to a maximum of $60,000 for every former franchisee of the plaintiffs that they could persuade to convert to Church's restaurant chain.
The provisions relating to the finder's fee payable to the plaintiffs are found in article VIII of the contract:
 "The finder's fee shall be one-percent (1%) of the gross sales from each such restaurant until the cumulative sum of Sixty Thousand Dollars ($60,000.00) has been paid to Mssrs. Tanner, Hovell, and Gollotte attributable to and from the operation of that particular restaurant. . . . The finder's fee shall be paid quarterly on the 15th day of each January, April, July and October until the $60,000.00 for each such restaurant is paid in full, based on sales for the preceding three month period. Notwithstanding the above, Church's obligates [sic] to pay a finder's fee as to a particular restaurant is contingent, if the restaurant is operated by a franchisee, upon Church's being paid its franchisee fee by such franchisee; it being understood that Mssrs. Tanner, Hovell and Gollotte, as to a franchise operation, will be paid only out of franchise fees collected by Church's from the operation of such restaurant. . . . Notwithstanding the above, under no circumstances shall the cumulative finder's fee for any one restaurant . . . exceed the sum of Sixty Thousand Dollars ($60,000.00), and if and when such cumulative upper limit is reached Church's obligation to pay finder's fee under this paragraph shall terminate."
In order for the conversions to take place, the franchisees who converted to become a franchisee of Church's were required *Page 451 
to pay to Church's a franchise fee of $5,000 and to incur approximately $10,000 in conversion costs (repainting the exterior, changing the signs, changing the menus). Crispy Chick paid one-half of these costs, $7,500, for each of the 17 conversions. Church's received 4% of all sales of the converted franchise restaurants thereafter.
This lawsuit was filed by the plaintiffs after Church's closed three restaurants that had converted from Crispy Chick franchises to Church's, and after another former Crispy Chick franchisee terminated its franchise agreement with Church's.[1] Church's claimed that the closings were part of its restaurant closing program implemented to close any restaurant that did not meet the sales quota of $250,000 per year. This dispute arose because Church's suspended the payment of any finder's fees relating to these four restaurants. Church's took the position that the closing of these restaurants terminated any finder's fee obligation on its part because there were no longer any gross sales out of which finder's fee payments could be made.
The plaintiffs do not contend that they were unconditionally guaranteed a finder's fee of $60,000 per restaurant, but that Church's actions in depriving the plaintiffs of that fee breached the express contractual obligation of "good faith" found in paragraph 9.12 of the contract:
 "Good Faith. In all matters in connection herewith, Church's and Sellers agree that each shall act in good faith in providing information or dealing with the others and in complying with the requirements hereof and otherwise consummating the transactions herein contemplated."
The trial court concluded:
 "[T]he plaintiffs [cannot] maintain a contract claim, since the failure to act in good faith in the performance or enforcement of contracts does not state a claim for relief that may be granted in Alabama. Government Street Lumber Co. v. AmSouth Bank, 553 So.2d 68, 72 (Ala. 1989). The good faith clause in the present Contract has the same effect and operation as the obligation of good faith that is implied in all contracts under common law and in sales contracts under Alabama's UCC. Such good faith obligations are directive rather than remedial and are not actionable absent an identifiable breach in the performance of specific terms of the contract."
We agree with the holding and reasoning of the trial court. Any suggestion that the plaintiff's bad faith claim can be pursued as a tort claim under the facts of this case, seems to have been settled in Kennedy Electric Co. v. Moore-Handley,Inc., 437 So.2d 76, 81 (Ala. 1983), wherein this Court stated, "We are not prepared to extend the tort of bad faith beyond the area of insurance policy cases." See Brown-Marx Associates,Ltd. v. Emigrant Savings Bank, 527 F. Supp. 277 (N.D.Ala. 1981), aff'd, 703 F.2d 1361 (11th Cir. 1983); Harrell v. ReynoldsMetals Co., 495 So.2d 1381, 1388 (Ala. 1986).
Neither is the plaintiffs' bad faith claim viable under contract law. The Court of Civil Appeals first addressed this issue in 1976, specifically holding that the failure to act in good faith in the performance or enforcement of contracts or duties arising under Ala. Code 1975, § 7-1-203, does not give rise to a claim on which relief may be granted in Alabama.Chandler v. Hunter, 340 So.2d 818 (Ala.Civ.App. 1976). Section 7-1-203, based on § 1-203 of the U.C.C., states:
 "Every contract or duty within this title [Commercial Code] imposes an obligation *Page 452 
of good faith in its performance or enforcement."
In Chandler, the court specifically stated that the violation of the obligation imposed by § 7-1-203 does not give rise to a claim on which relief may be granted. In Government StreetLumber Co. v. AmSouth Bank, 553 So.2d 68 (Ala. 1989), this Court adopted verbatim the reasoning of the Court of Civil Appeals in Chandler, and held that § 7-1-203 was intended to be directive, not remedial. 340 So.2d at 821.
The plaintiffs attempt to distinguish these two cases by arguing that the issue in those cases involved the implied obligation of good faith found in the Uniform Commercial Code, not an express obligation of good faith found in a written commercial contract, as in this case. The plaintiffs cite us to no Alabama authority suggesting that a written obligation of good faith would create a higher duty on a contracting party than that imposed by the law of contracts, and we have found none. We find no support for the contention that the breach of an express obligation is actionable where the breach of the same obligation, if merely implied, would not be. In fact, "whatever is necessarily implied in a contract is as much a part thereof as if expressly stated therein." Broyles v. BrownEngineering Co., 275 Ala. 35, 151 So.2d 767 (1963).
This Court has clearly and specifically held that a duty of good faith in connection with a contract is directive, not remedial, and that therefore an action will not lie for breach of such a duty. Government Street Lumber Co., 553 So.2d 68. The directive nature of the duty is in no way related to the fact that it is implied rather than expressed. Accordingly, we agree with the trial court's conclusion:
 "The good faith clause in the present Contract has the same effect and operation as the obligation of good faith that is implied in all contracts under common law and in sales contracts under Alabama's UCC."
Based on the foregoing, we hold that the plaintiffs' breach of contract claim — that Church's breached the good faith provision of the purchase agreement — was properly dismissed.
There are no public policy considerations that would cause us to hold otherwise. In Chavers v. National Sec. Fire Cas. Co.,405 So.2d 1, 6 (Ala. 1981), we set out the policy consideration that led us to recognize the intentional tort of bad faith in first-party insurance actions:
 "The law will not allow an insurer to wilfully refuse to evaluate or honor a claim with the knowledge that the avowed purpose of the insurance contract was to protect the insured at its weakest and most perilous time of need."
This policy consideration, which underpins our recognition of a redressable tort in the case of an intentional breach of good faith in the context of first-party insurance contracts, is not present in the context of contracts between these private parties, both commercial enterprises. The plaintiffs and Church's were represented by counsel during negotiations and upon execution of the purchase agreement; neither the plaintiffs nor Church's was at its "weakest [or] most perilous time of need."
Because we hold that there is no remedy for breach of an express promise in a contract to "act in good faith," we do not address whether there is substantial evidence in the record to support the plaintiffs' claim. Therefore, based on the facts of the present case, we hold that in order to prove a breach of the purchase agreement on the part of Church's, the plaintiffs must prove that Church's expressly breached some other specific term of the purchase agreement.
Regarding the specific terms of this purchase agreement, it is well settled that words ought to be given their ordinary meaning, and the intention of both parties is to be derived from the provisions of the purchase agreement itself. SeeFood Service Distributors, Inc. v. Barber, 429 So.2d 1025, 1028
(Ala. 1983). Furthermore, it is elementary that the terms of the written purchase agreement, not the mental operations of one of the parties, control its interpretation. See Kinmon v.J.P. King Auction *Page 453 Co., 290 Ala. 323, 325, 276 So.2d 569, 570 (1973).
Because the terms of the purchase agreement are unambiguous, it was the trial court's duty to analyze and determine the meaning of the purchase agreement. When appropriate, the meaning of a contract may be determined at the summary judgment stage. Government Street Lumber Co., 553 So.2d 68, citingWilliams v. Bank of Oxford, 523 So.2d 367 (Ala. 1988); Medleyv. SouthTrust Bank, 500 So.2d 1075 (Ala. 1986); Colonial Bankv. Coker, 482 So.2d 286 (Ala. 1985).
We hold that the finder's fee provisions of the contract are clear and unambiguous and that the trial court properly construed them according to their ordinary interpretation to mean that Church's owed the plaintiffs a finder's fee only for restaurants that produced gross sales. See Terry Cove North,Inc. v. Baldwin County Sewer Authority, Inc., 480 So.2d 1171
(Ala. 1985); Wheeler v. First Alabama Bank of Birmingham,364 So.2d 1190 (Ala. 1978). Church's did not breach the contract by closing the three franchises and thereby depriving the plaintiffs of the concomitant finder's fee.
As the trial court stated:
 "The plaintiffs could have included protective language in the Contract to ensure a finder's fee in the event that restaurants were closed or franchises terminated, but they did not include any such language. The written terms of the Contract govern. Church's is entitled to summary judgment on those causes of action sounding in contract and alleging entitlement to a $60,000.00 finder's fee per restaurant."
The plaintiffs amended their complaint to claim liability on the theories of fraud and suppression of a material fact. See Ala. Code (1975), § 6-5-101. Church's claims that there was no evidence to support these theories, and that claims based on them were time-barred, in any event.
This Court set forth the elements of fraud in Earnest v.Pritchett-Moore, Inc., 401 So.2d 752, 754 (Ala. 1981), as follows:
 "Under this principle there must be (1) a false representation (2) concerning a material existing fact (3) relied upon by the plaintiff (4) who must be damaged as a proximate result. International Resorts, Inc. v. Lambert, Ala., 350 So.2d 391 (1977) and cases cited."
The plaintiffs contend that they were promised that any future franchise contracts with former Crispy Chick franchisees would have initial terms of 15 years. The contract was entered into in December 1985, and the subsequent franchise agreements were entered into during the following year. The plaintiffs contend that they did not become aware that the franchise contracts did not have 15-year terms until March 1990, and that prior to this time they were unaware of the terms of the franchise contracts entered into between Church's and the plaintiffs' former franchisees.
The trial court properly concluded that these claims are barred by the applicable two-year statute of limitations. Ala. Code 1975, § 6-2-3. The court noted that "even if the plaintiffs did not have actual knowledge of the contents of the franchise agreements, the information was available from sources which were readily accessible. . . . The evidence is clear that the plaintiffs had access to such information but did not act on it." We agree. The law requires that a plaintiff exercise reasonable diligence in determining the facts of an alleged fraud. Batchelor v. Batchelor, 502 So.2d 751, 754 (Ala. 1987).
Furthermore, even if the fraud and suppression claims were not time-barred, they are not supported by the evidence. The contract lacks any suggestion that franchise terms would last 15 years. Furthermore, it does not appear that the plaintiffs were damaged by any such alleged fraud, because they were aware that the standard franchise agreement that was attached to the contract and made a part of it allowed the franchisee to terminate at any time on 60 days' notice.
Summary judgment is proper only when the record, viewed in the light most favorable to the nonmoving party, shows that *Page 454 
there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Rule 56(c), Ala.R.Civ.P.; Patrick v. Crain, 571 So.2d 285 (Ala. 1990). In the present case, the facts in the record fail to show evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach a different conclusion as to the material facts. The lack of any evidence of breach of contract or fraud makes the summary judgment appropriate.
For the foregoing reasons, the judgment of the trial court is due to be, and it hereby is, affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, SHORES, ADAMS, HOUSTON, STEAGALL and INGRAM, JJ., concur.
KENNEDY, J., concurs in the result.
[1] The finder's fee paid to the plaintiffs by Church's with respect to each of the restaurants from the date of purchase until the date of closing was approximately the following:
Livingston $8,182.73 Demopolis $6,661.58 Marion $4,033.16
The owner of the converted franchise store in Centreville was permitted to voluntarily terminate its franchise agreement with Church's and to cease operating its restaurant as a Church's franchisee. Church's permitted the restaurant to be operated as an independent "Chick-A-Dee" restaurant.
The finder's fee paid to the plaintiffs with respect to the restaurant in Centreville was approximately $7,708.76.